IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| OPTIMORPHIX, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 23-1249-MN |
| | ) | |
| ORACLE CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(6)**

OF COUNSEL:
Jared Bobrow
Diana Rutowski
Jason Yu
Parth Sagdeo
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park CA  94025-1015
(650) 614-7400

Michael Chow
ORRICK, HERRINGTON & SUTCLIFFE LLP
2050 Main Street, Suite 1100
Irving, CA 92614
(949) 567-6700

Sarah Mullins
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
(415) 773-5700

Dated: January 18, 2024

John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Lindsey M. Gellar (No. 7202)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
lgellar@shawkeller.com
*Attorneys for Defendant*

# TABLE OF CONTENTS

**Page No.**

I.      NATURE AND STAGE OF THE PROCEEDING ........................................................ 1

II.     SUMMARY OF ARGUMENT ................................................................................... 1

III.    STATEMENT OF FACTS ......................................................................................... 2

IV.     PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM ................................. 3

        A.      Rule 12(b)(6) Requires Factual Allegations, Not Mere Conclusions ................... 3

        B.      The Complaint Fails To State A Plausible Claim For Patent Infringement ......... 4

                1.      The '314 Patent ............................................................................... 5

                2.      The '871 Patent ............................................................................... 6

                3.      The '169 Patent ............................................................................... 7

                4.      The '021 Patent ............................................................................... 9

                5.      The '273 Patent ............................................................................. 10

                6.      The '901 Patent ............................................................................. 11

                7.      The '418 Patent ............................................................................. 13

                8.      The '664 Patent ............................................................................. 15

        C.      Having Failed To Plead Direct Infringement, OM's Indirect Infringement
                Claims Also Must Fail ..................................................................................... 17

        D.      The Complaint Presents A Burdensome And Administratively Complex
                Case That Can And Should Be Simplified ........................................................ 17

V.      CONCLUSION ...................................................................................................... 18

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).................................................................................................3, 4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................................3

*In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*,
681 F.3d 1323 (Fed. Cir. 2012)................................................................................17

*Bot M8 LLC v. Sony Corp. of Am.*,
4 F.4th 1342 (Fed. Cir. 2021) ........................................................................ *passim*

*Golden v. Intel Corp.*,
No. 2023-1257, 2023 WL 3262948 (Fed. Cir. May 5, 2023)....................3, 4, 5, 15

*Lexington Luminance LLC v. Bulbrite Indus., Inc.*,
2023 WL 143911 (D.N.J. Jan. 10, 2023) ...................................................................3

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017)....................................................................................4

*Vervain, LLC v. Micron Tech., Inc.*,
2022 WL 23469 (W.D. Tex. Jan. 3, 2022) .................................................................3

**Other Authorities**

Federal Rule of Civil Procedure 12(b)(6) ..................................................................1, 3

## I.     NATURE AND STAGE OF THE PROCEEDING

Plaintiff OptiMorphix, Inc. ("OM") filed this lawsuit on November 1, 2023, alleging that Defendant Oracle Corporation ("Oracle") infringes eight patents that relate to network communications, video, and multimedia: U.S. Patent Nos. 7,031,314 (the "'314 patent"); 7,099,273 (the "'273 patent"); 7,444,418 (the "'418 patent"); 7,586,871 (the "'871 patent"); 8,429,169 (the "'169 patent"); 8,521,901 (the "'901 patent"); 9,167,021 (the "'021 patent"); and 9,191,664 (the "'664 patent").  Complaint, D.I. 1 ("Compl."); *id.*, Exs. 1-8.  Oracle now moves to dismiss under Federal Rule of Civil Procedure 12(b)(6).

## II.    SUMMARY OF ARGUMENT

OM's complaint fails to state a plausible claim for infringement and should be dismissed. OM alleges that more than a dozen different Oracle products and services infringe one or more of eight unrelated patents.  Despite the breadth of its complaint, OM's claims of infringement are conclusory, incomplete, and lacking in factual allegations.  The complaint largely just parrots claim language without reciting any facts suggesting that Oracle's products practice the claims.  In some cases, OM fails even to allege that critical claim limitations are met at all.  In other cases, OM's allegations cite and rely on incorporated documents that are actually inconsistent with, and thus undermine the assertion of, infringement.

OM's scattershot—and incomplete—approach culminates in a set of allegations that fail to put Oracle on notice of OM's infringement claims.  To address this, Oracle reached out to OM's counsel on January 10, 2024, outlined the complaint's deficiencies, and invited OM to amend its complaint to cure the defects or withdraw its claims, but OM declined to amend.  Moving forward with OM's complaint will require the Court and the parties to construe a myriad of terms across eight patents, supervise and conduct discovery on at least 16 Oracle products and features, contend

with depositions of up to 22 different named inventors, address summary judgment and *Daubert* issues across these patents and products, and try a case that no doubt will involve double-digit numbers of fact and expert witnesses and hundreds of exhibits.  Before allowing OM to impose these costly and time-consuming burdens on the Court and Oracle, OM should be required to justify this undertaking by pleading facts – not mere conclusions—which suggest that infringement is plausible.  Its failure to do so warrants dismissal.

## III.   STATEMENT OF FACTS

OM, which was incorporated in Delaware on February 17, 2023, acquired a "portfolio of patents developed at Bytemobile and later Citrix."  Compl. ¶ 8; Ex. A.  Since September 27, 2023, OM has launched a litigation campaign of tremendous scope, asserting these patents in seven different cases in the District of Delaware and the Eastern District of Texas.[1]  Nowhere in the complaint does OM allege that it makes any products or performs any methods covered by the patents-in-suit.

OM asserts eight patents against Oracle that relate to network communications, video, and multimedia.  Compl. ¶¶ 15-76.  OM accuses at least 16 Oracle products and services and multiple unspecified versions thereof of infringing its patents.  *Id.* ¶¶ 77-279.

On January 10, 2024, counsel for Oracle sent a letter to counsel for OM that outlined the deficiencies addressed herein, indicated Oracle's intent to file the instant motion, and invited OM to amend or meet and confer.  Ex. B.  OM's counsel responded by email on January 16, 2024, and confirmed on a follow-up call that it would not be amending the Complaint to address the deficiencies.  Ex. C.

---

[1] Case Nos. 23-cv-1065 (D. Del.), 23-cv-1146 (D. Del.), 23-cv-123 (E.D. Tex.), 23-cv-1249 (D. Del.), 23-cv-126 (E.D. Tex.), 23-cv-134 (E.D. Tex.), 23-cv-150 (E.D. Tex.).

## IV.     PLAINTIFF'S COMPLAINT FAILS TO STATE A CLAIM

### A.     Rule 12(b)(6) Requires Factual Allegations, Not Mere Conclusions

A court should dismiss claims challenged under Rule 12(b)(6) when the pleading does not contain enough factual allegations to state "plausible" claims for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A "plausible" claim requires more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 555; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

To state a claim for relief for patent infringement, a plaintiff must plead "factual content" creating a reasonable inference that the accused product or method infringes the asserted patent claims. *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1352-53 (Fed. Cir. 2021) ("There must be some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim") (citations omitted). "[A] plaintiff cannot assert a plausible claim for infringement ... by reciting the claim elements and merely concluding that the accused product has those elements.'" *Golden v. Intel Corp.*, No. 2023-1257, 2023 WL 3262948, at *2 (Fed. Cir. May 5, 2023) (citing *Bot M8 LLC*, 4 F.4th at 1352-53). This is particularly true for those claim limitations that go to the heart of the invention or point of novelty. *See Bot M8*, 4 F.4th at 1353 ("The level of detail required in any given case will vary depending upon a number of factors, including … the materiality of any given element to practicing the asserted claim(s)."); *Vervain, LLC v. Micron Tech., Inc.*, 2022 WL 23469, at *5 (W.D. Tex. Jan. 3, 2022) (interpreting *Bot M8* to require "a higher level of detail in pleading infringement … for elements clearly 'material' to novelty and non-obviousness"); *Lexington Luminance LLC v. Bulbrite Indus., Inc.*, 2023 WL 143911, at *5 (D.N.J. Jan. 10, 2023) (agreeing with the *Vervain* court that a "higher level of detail

3

in pleading infringement" may be demanded for "elements clearly 'material' to novelty and non-obviousness").  Omitting factual allegations suggesting that the accused products include the "key language from the identified claims that would be essential for proving infringement" fails to "place [a defendant] on notice of what activity ... is being accused of infringement" and should be dismissed.  *Golden*, No. 2023-1257, 2023 WL at *2 (quoting *Bot M8 LLC*, 4 F.4th at 1352).

The tenet that a court must accept as true all of the allegations contained in a complaint is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  The tenet also does not apply to "allegations that contradict matters properly subject to judicial notice or by exhibit, such as the claims and the patent specification." *Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) (quotations and citations omitted).  "Where … the factual allegations are actually inconsistent with and contradict infringement, they are likewise insufficient to state a plausible claim." *Bot M8 LLC*, 4 F.4th at 1354.  Thus, "a patentee may subject its claims to early dismissal by pleading facts that are inconsistent with the requirements of its claims." *Id*. at 1346.

**B.     The Complaint Fails To State A Plausible Claim For Patent Infringement**

Across OM's complaint, there are three primary and interrelated deficiencies in OM's allegations.  First, the complaint merely parrots claim language without providing factual allegations that identify *what* in the accused product allegedly meets the claim elements.  This style of pleading is insufficient to state a claim.  *See Bot M8 LLC*, 4 F.4th at 1352-55 ("mere recitation of claim elements and corresponding conclusions, without supporting factual allegations, is insufficient to satisfy the *Iqbal*/*Twombly* standard").  Second, in multiple instances, OM fails to allege that Oracle's products include critical claim limitations.  *See Golden*, 2023 WL 3262948, at *2 (allegations that "omit key language … that would be essential for proving infringement" fail to meet the plausibility standard and should be dismissed).  Third, in other instances, the documents that OM incorporates by reference into its pleading are "actually

4

inconsistent with and contradict infringement," and thus are "insufficient to state a plausible claim." *Bot M8*, 4 F.4th at 1354.  Based on these failures, OM's complaint should be dismissed.

1.    ***The '314 Patent***

The '314 Patent relates to the delivery of "differentiated services," such as email compression (which reduces the size of email data packets), to different types of network traffic. *See* '314 Patent, 2:20-27.  Prior art systems often required email-related data packets to be "explicitly address[ed]" to a proxy server (an intermediary server between an email sender and receiver) in order for the packets to be identified and routed to email compression software. *Id.*, 1:59-2:3.  The '314 Patent purports to have streamlined this process by automatically detecting and routing network traffic according to predetermined rules.  For example, asserted claim 27 recites a system that is capable of (1) classifying a connection between a client and server based on whether the connection "matches a predetermined service criteria"; (2) forming connections between the client and a service module and between the service module and the server; and, (3) "redirect[ing] at least a portion of data communicated between the client and the server to the service application associated with the predetermined service criteria." *Id.*, claim 27.

OM alleges that "Oracle Cloud Infrastructure (including Oracle Traffic Management and Oracle Network Load Balancer)" and Oracle's "Fusion Middleware" software, "including Oracle Traffic Director," infringe claim 27.  Compl. ¶ 79.  But OM's allegations do not state a plausible claim because OM never alleges what in Oracle's products corresponds to the "service module" or "service application" or what "predetermined service criteria" the Oracle products use to classify and redirect network traffic.  Instead, the complaint simply recites the claim language with minor, non-substantive alterations.  *See, e.g., id.* ¶¶ 87 ("The Oracle '314 Products contain functionality for establishing an initial connection between the client and the service module, and a subsequent connection between the service module and the server ...."), 91 (alleging that the

accused products "redirect a portion or more of the data communication between the client and a server towards the service application related to the pre-established service parameters"). Much more is required to state a plausible claim for relief. *See Bot M8*, 4 F.4th at 1353 (holding that "reciting the claim elements and merely concluding that the accused product has those elements" is insufficient to state a claim).

Even if OM were to contend that Oracle's Traffic Director software is the "service application" (the complaint does not allege this), it still has not stated a plausible claim. None of the product-related documents or video screenshots included in the complaint show or suggest that Oracle's products "redirect at least a portion of data communicated between the client and the server *to the service application* associated with the predetermined service criteria," as claim 27 requires. In fact, they show the opposite: they show Traffic Director redirecting network traffic *from* Traffic Director *to* back-end servers. *See* Compl. ¶ 87 (showing traffic being distributed by Traffic Director instances to "a server pool in the back end"). In other words, nothing in the complaint suggests that data is being communicated *to* Traffic Director. Where allegations in a complaint are "actually inconsistent with and contradict infringement," they are "insufficient to state a plausible claim." *Bot M8*, 4 F.4th at 1354.

### 2. *The '871 Patent*

The '871 Patent relates to "method[s] for processing data communication[s]." *See* '871 Patent, claim 1. One example of "processing" is content filtering by a "node" located between two computers connected over a network. *Id.*, 1:47-60, 2:23-39, 3:15-39. The patent purportedly speeds up the filtering process by only filtering content *requests* (which tend to be small and can be processed quickly) while letting *responses* to those requests (which tend to be large and take a long time to process) pass through the node without processing. *Id.*, 4:37-43. Asserted claim 1 captures that purported improvement. It recites steps for detecting and processing an initial "data

communication" from a first data network at the node, and then detecting "return data communication arriving at the node from [a] second data network … and allowing the detected return data communication to pass through the node without processing." *Id.*, claim 1.

OM alleges that the "Threat Intelligence" and "Network Firewall" functionality of Oracle's Cloud Infrastructure infringes claim 1 because it monitors *incoming* communications and determines whether to allow or disallow the communication based on "rules and policies configured by" the Oracle products.  Compl. ¶¶ 161, 164-67.  But OM fails to identify any "return" communications, allege how such communications would arrive at the same node, state how such communications would be detected at that node, or allege how such communications would be allowed to pass through the node without any processing.  Instead, OM merely parrots the claim language in conclusory fashion.  *Id.*, ¶¶ 168 ("The Oracle '871 Products detect a return data communication arriving at the node from the second data network in response to the processed data communication from the first data network.  Further the Oracle '871 Products allow the detected return data communication to pass through the node without processing."), 169 ("The Oracle '871 Products monitor the incoming data communication from the second data network.  If the detected return data communication is associated with prior processed data communication from the first network the Oracle '871 Products determine that the return data communication does not need further processing at the node.").  Because OM simply recites claim elements and concludes that the accused products have them without any supporting factual allegations, it has failed to assert a plausible claim for infringement.  *See Bot M8*, 4 F.4th at 1353.

### 3. *The '169 Patent*

The '169 Patent discloses and claims a specific method of caching content on the Internet. Content caching, the '169 Patent explains, is a prior art technique in which a "cache" located between a user and a web server serves web content to the user.  '169 Patent, 3:6-16.  Instead of

communicating directly with a web server, requests from the user first go to the cache. *Id.*, 8:29-37. The cache then uses a lookup "index" (akin to a book index) to determine whether it already is storing the requested content. *Id.* If, based on the lookup index, the cache has the requested content, then the cache directly provides the requested content to the user. *Id.* Otherwise, the cache requests the content from the web server, stores and indexes it, and forwards it to the user. *Id.*, 8:38-54. According to the '169 Patent, prior art caches used a requested URL (*e.g.*, youtu.be/ax7QHQTbKQE, which points to the Federal Judicial Center's patent video for jurors) as the lookup index of the cache. Using a URL as the cache index is disadvantageous, the '169 Patent contends, because multiple different URLs might point to the same content, causing the same content to be stored multiple times. *Id.*, 3:17-62.

As reflected in asserted claim 1, the '169 Patent purports to overcome the problems associated with URL-based indexing by "requesting, from a web server, a portion of content associated with the received content request," and using that "portion" to generate a cache index. *Id.*, claim 1; 8:18-54. The use of a "portion" of the requested content to generate a cache index is at the heart of claim 1. During prosecution, the applicant distinguished the prior art as not disclosing this "requesting . . . a portion" limitation. Ex. D (Nov. 1, 2012 Reply to OA), at 11-13.

Despite the centrality of this limitation, OM has not even attempted to plead that Oracle performs it. OM contends generically that Oracle Cloud Infrastructure's ("OCI's") caching feature infringes. Compl. ¶¶ 183-200. But the complaint's generic allegations cannot suffice when the '169 Patent admits that web caching was known in the prior art, and the complaint does nothing to suggest that OCI uses a portion of the content to generate a cache index. Instead, the complaint actually shows that Oracle uses the noninfringing URL-based approach that the '169 Patent admits is prior art—specifically, the complaint includes documentation showing that OCI's caching

feature uses a requested URL to generate the cache index.  *Id.* ¶ 187 (accusing the "URL_PART_CONTAINS" criterion).  OM cannot state a plausible claim when the very documentation on which it relies does not support its claim and, to the contrary, suggests that Oracle uses an admitted prior art approach.  *Bot M8*, 4 F.4th at 1346 ("[A] patentee may subject its claims to early dismissal by pleading facts that are inconsistent with the requirements of its claims.").

### 4.   ***The '021 Patent***

The '021 Patent claims a way to measure how long it takes for a user to download a webpage.  When a user requests a webpage, the user must download not just the page itself (typically an HTML file), but also all other objects (*e.g.*, images and source code) to which the page refers (the page's "embedded objects").  '021 Patent, 1:7-25.  The user retrieves each webpage and embedded object using a separate HyperText Transfer Protocol ("HTTP") transaction.  *Id.*  Thus, a webpage's download time includes not just the time taken by the HTTP transaction for the webpage itself, but also the time taken by the HTTP transactions for the page's embedded objects.  The '021 Patent acknowledges that it was known in the prior art how to measure webpage download time at a user's device or, in some cases, at a web server; doing so is "straightforward" because these devices have "complete knowledge" of each webpage's associated objects.  *Id.*, 1:26-45.  But, the '021 Patent contends, it was infeasible to measure webpage download time at an intermediate network node—that is, a node between the user and the server—because an intermediate node lacks the information needed to associate HTTP transactions for embedded objects with the objects' respective webpages.  *Id.*, 1:46-58.

The purported invention of asserted claim 1 is a technique that allows an intermediate network node to measure a webpage's download time.  It does so by "creating a boundary of a page unit" and grouping HTTP transactions into one "transactions set" (corresponding to a

webpage) or another based on the "boundary." '021 Patent, claim 1.   If an HTTP transaction occurs prior to the "boundary," it "belongs with [a] previous transaction set." *Id.*  If the transaction occurs after the "boundary," it "does not belong with the previous transactions set." *Id.*

"Creating a boundary of a page unit" is at the heart of the '021 Patent's claimed invention. During prosecution, the applicant distinguished the prior art as not disclosing the "boundary" limitation.  Ex. E (Dec. 23, 2014 Remarks in Response to Final OA), at 20.  In short, the '021 Patent's claimed invention is not merely measuring page download times, but specifically doing so by creating a temporal "boundary of a page unit" and associating an observed transaction with one webpage or another depending on whether the transaction was before or after the "boundary."

The complaint fails to plausibly allege that the accused Oracle products—Oracle Cloud Infrastructure (OCI) and Oracle Cloud Management (OCM) (including Oracle IT Analytics and Application Performance Monitoring) (Compl. ¶ 230)—practice this critical "boundary" limitation.  The complaint includes only the following two sentences for this limitation: "In cases where a transaction is evaluated as not belonging to the current set, a 'page boundary' is created by the Oracle '021 Products.  This boundary serves as a cutoff for metrics calculations like average time spent on a page or session."  *Id.* ¶ 242.  These allegations do not plausibly allege that the accused Oracle products associate an observed transaction with one webpage or another depending on whether the transaction was before or after a temporal "boundary of a page unit," as claimed. OM's first sentence is a mere restatement of the claim language without any factual content and is therefore not sufficient.  OM's second sentence, even if taken as true, merely describes how the alleged "boundary" is used—not what the "boundary" in the accused Oracle products is or how it is created, which is what OM must plausibly allege to state a claim for infringement.

5.    ***The '273 Patent***

The '273 Patent claims a method of transferring data from a sender to a receiver.  *See* '273

Patent, Claim 1. The claims involve measuring and controlling parameters related to the performance of the network. *See id.* The crux of the claims involves setting the period of a "transmit timer" and using that timer to trigger the sending of data ("additional data packets") to the receiver. *See id.* The patent states that its alleged improvements to network performance are gained "by utilizing a transmit timer incorporated within the sender device." *Id.*, Abstract.

OM alleges that "Oracle Linux Release 7.5 and later" software on two different computer architectures infringes claim 1 of the '273 Patent. *See* Compl. ¶¶ 106-21. However, the complaint fails to plead any facts suggesting that Oracle's products include a "transmit timer" as required by the claims. *Id.* The "transmit timer" limitation is a critical piece of the claims, as it is allegedly how the patent's improvement is "achieved." '273 Patent, Abstract. Rather than make factual allegations showing the existence of the "transmit timer," OM just parrots the claim language. OM's complaint says only that: "The Oracle '273 Products transmit additional data packets to the receiver in response to a transmit timer expiration. The period of the transmit timer is based on the round-trip time measurements and the congestion window parameter." Compl. ¶ 121. This is nothing more than a conclusion. OM's "mere recitation" of this critical "transmit timer" limitation does not "satisfy the *Iqbal/Twombly* standard." *Bot M8 LLC*, 4 F.4th at 1355.

6. ***The '901 Patent***

The '901 Patent claims a method for a "packet scheduler" in a data communication system to prevent bursts of data from being sent over the network. *See* '901 Patent, Claim 1. The "packet scheduler" receives data from a "sending layer" and delays delivery of that data to a "receiving layer" based on a calculated delay time, where the "scheduler" and the two "layers" are components of the same device. *See id.* During prosecution, the Applicant overcame a rejection by amending the claims to require calculating a delay time for transmissions determined to be part of a "bursty transmission" and using that delay time to delay delivery of data (the "TCP packet")

11

to the "receiving layer." *See* Ex. F (Jan. 4, 2013 Reply to OA) at 2, 7, 11-12.  The Patent Office allowed the application on this basis.  *See* Ex. G (May 10, 2013 Notice of Allowance) at 3-4.

OM's claim should be dismissed because OM alleges facts inconsistent with the claim language, thereby rendering its claim implausible.  First, OM alleges that the Oracle products meet the claim requirement of "calculating a delay time for a connection using the last packet delivery time after determining that the TCP packet is part of a bursty transmission" when the products "measure latency and jitter for each connection/link" and then use the measurement "to determine the burstiness of a TCP packet transmission."  Compl. ¶ 215; '901 Patent, Claim 1.  But this allegation is inconsistent with the claim language because it pleads that the delay calculation occurs *before* determining "burstiness," not *after* as required by the claims.  *See id*.  The complaint is thus inconsistent with the claims and cannot plausibly allege infringement.  *See Bot M8 LLC*, 4 F.4th at 1354 ("Where … the factual allegations are actually inconsistent with and contradict infringement, they are likewise insufficient to state a plausible claim.").

Second, OM's allegation that the Oracle products meet the claim requirement of "delaying delivering the TCP packet to a receiving layer based on the calculated delay time, wherein the **receiving layer is one of the network interface layer or the transport layer** that is not the sending layer" also is inconsistent with the claim language.  '901 Patent, Claim 1 (emphasis added); Compl. ¶ 216.  OM appears to plead that a "stream" in Oracle's products is the claimed "receiving layer."  Compl. ¶ 216.  The Oracle document on which OM's complaint relies states that "[a] stream can be thought of as a **sub-layer between the transport layer and the upper layer**."  *Id.* (emphasis added).  The '901 Patent describes the sequence of layers in the "network architecture on a host or a server" using the division of the "Open Systems Interconnection Basic Reference Model (OSI Model)."  '901 Patent, 3:30-44.  This division makes clear that the network

interface layer is below the transport layer.  Specifically, the '901 Patent describes the seven layers of the network architecture from bottom to top: "the physical layer, the data link layer (which can further include the logical link control (LLC) sublayer and the media access control (MAC) sublayer), network layer, transport layer, session layer, presentation layer, and application layer"). *Id*. at 3:35-39, 3:42 ("Application Layer 210 is the topmost layer").  This layering is shown visually throughout the figures in the specification:



*See, e.g., id*. Fig. 2A; 3:63-65 ("TCP/IP Stack Layer 220 may include, among other things, the transport layer"). Because the accused Oracle "stream" is "between the transport layer and the upper layer" (*i.e.*, it is above the transport layer), and because the network interface layer is below the transport layer, the "stream" cannot be "one of the network interface layer or the transport layer."

### 7.   *The '418 Patent*

The '418 Patent purportedly addresses "disruption or significantly degraded performance" of multimedia (*e.g.*, audio and video data) caused by bandwidth-constrained networks.  '418 Patent, 1:38-50.  Asserted claim 1 does so by redirecting multimedia data encoded at an original data rate to a "service module" to "transcode" that data (which involves converting the data from one form to another) to a lower data rate to match an "available transmission rate" on the

constrained network if the original data rate is greater than the available transmission rate. *Id.*, claim 1. This "available" rate is "estimated" by the service module using the time it takes for data to make the trip between the service module and a receiver. *Id.*

OM asserts that Oracle WebRTC Session Border Controller and Oracle Communications Session Border Controller, Releases S-CZ7.2.0 and later infringe at least claim 1. Compl. ¶¶ 135, 155. OM's complaint, however, does not plead any facts suggesting that the Oracle products meet the critical limitations of claim 1.[2] Instead, OM merely parrots the claim language and recites bare conclusions. Compl. ¶¶ 137-48. For example, for "estimating an available transmission rate," OM alleges:

> The Oracle '418 Products contain functionality for estimating an available transmission rate of a receiver-side connection. This step is critical for dynamically adapting the multimedia stream to match the capabilities of the receiving end and the conditions of the network. The estimation process performed by the Oracle '418 Products involves measuring the trip time of data packets communicated between the service module and the receiver via the second channel.

*Id.*, ¶ 140. These are conclusions, not factual allegations. Moreover, the documents to which the complaint refers for support (*id.*, ¶¶ 137, 143) say nothing about estimating transmission rates, let alone an estimate involving the trip time of communicated data. Similarly, for the limitation that requires "transcoding" multimedia data "if the first transmission rate is greater than the available transmission rate," OM pleads conclusions, not facts:

> The Oracle '418 Products contain functionality that, if the first transmission rate is greater than the available transmission rate, transcodes the digital multimedia information to conform the digital multimedia information to the available transmission rate. Specifically, the Oracle '418 Products determine if there is a need for transcoding by comparing the first transmission rate (original

---

[2] The patent applicant argued that the "estimating" and "transcoding" limitations are what distinguished the '418 patent claims from prior art. *See, e.g.* Ex. H (Jan. 5, 2007 Response to OA), at 9-10 and Ex. I (Sept. 14, 2007 Response to OA), at 11-12.

encoding rate) with the estimated available transmission rate.

Compl. ¶ 142. Once again, these are bare conclusions, not factual allegations. And once again, the excerpts from the documents to which the complaint refers for support do not make infringement plausible because they do not describe transcoding data to a lower estimated available transmission rate if the original encoding rate is greater than an estimated available transmission rate.[3] *Id.*, ¶¶ 137, 143. An allegation that Oracle products simply transcode data is not enough because transcoding was known in the prior art. *See, e.g.* Ex. J (Apr. 6, 2007 OA), at 2-4 (identifying prior art that disclosed transcoding). Because OM simply "recite[s] the claim elements and merely conclud[es] that the accused [Oracle products have] those elements," OM fails to state a plausible claim for infringement. *Golden*, 2023 WL 3262948 at *2.

### 8. *The '664 Patent*

The '664 patent discloses a system and method that adjust the bitrate of streaming media (*i.e.,* audio and video) based on network capacity to optimize the viewing and listening experience for a user and to avoid problems that arise when transferring data at a fixed bitrate over a connection that lacks sufficient bandwidth. '664 Patent, 1:23-35; 2:44-55. Asserted claim 9 does this by "receiving" an "optimal session bitrate," "allocating" that optimal session bitrate to produce an "optimal audio bitrate" and an "optimal video bitrate," and then "encoding" the audio data and video data using their respective optimal bitrates. *Id.*, claim 9.

OM asserts that the Oracle Cloud Infrastructure ("OCI"), including "Media Services,

---

[3] These same deficiencies exist for other claim elements, as the cited documents fail to disclose breaking a connection between a transmitter and a receiver, forming first and second channels, or redirecting data to a service module. In fact, OM fails even to allege that the Oracle products perform the steps of breaking a connection, forming first and second channels, and redirecting data to a service module. These are all essential steps of claim 1, and OM's deficient allegations about them provide another independent basis to dismiss OM's claim. *See* Compl. ¶¶ 133-58; *see Golden*, 2023 WL 3262948 at *2 (allegations that "omit key language … that would be essential for proving infringement" fail to meet the plausibility standard and should be dismissed).

Media Streams, and Media Flow functionality," infringe claim 9. Compl. ¶ 255. OM, however, fails to allege sufficient facts to create a plausible inference that the Oracle products encode audio data using an optimal audio bitrate and encode video data using an optimal video bitrate. The document on which OM relies for its allegations actually undermines OM's claim, because the excerpt discusses only *transcoding* data; it mentions nothing about *encoding data*:



*Stream Video Using OCI Media Services*, ORACLE CLOUD INFRASTRUCTURE BLOG (December 1, 2022), available at: https://blogs.oracle.com/cloud-infrastructure/post/stream-video-using-oci-media-services.

*Id.*, ¶ 260. This is fatal to OM plausibly alleging infringement, because transcoding and encoding are different processes. As OM admits, encoding is the process of "compressing the ***raw [] data*** according to a specific encoding algorithm." *Id.* ¶¶ 264, 266 (emphasis added). Transcoding, however, is a different process that involves receiving already encoded data and altering it. *See, e.g.*, '418 Patent, Abstract ("If the transmission rate at which the multimedia information is encoded is greater than the available transmission rate, the multimedia information may be transcoded to conform the multimedia information to the available transmission rate.").

Furthermore, OM never pleads any facts suggesting that Oracle's products "allocate[e] the optimal session bitrate between the audio media data and the video media data to produce an optimal audio bitrate and an optimal video bitrate," another required step of claim 9. Instead, the cited excerpts describe receiving media data, transcoding the media data, and transmitting the transcoded data to a consumer—not allocating an optimal bit rate between audio and video data.

*See* Compl., ¶¶ 257-58, 260, 265.   Given the absence of factual allegations supporting the "allocating" limitation, OM's claim is implausible and should be dismissed.

### C.   Having Failed To Plead Direct Infringement, OM's Indirect Infringement Claims Also Must Fail

Because OM fails to adequately plead direct infringement, its indirect infringement claims also fail and must be dismissed.  *See In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1333 (Fed. Cir. 2012) ("Because liability for indirect infringement of a patent requires direct infringement, … complaints must plausibly allege that the [asserted] patent was directly infringed to survive [a] motion to dismiss.").

### D.   The Complaint Presents A Burdensome And Administratively Complex Case That Can And Should Be Simplified

Given the broad scope of the Complaint, this case will consume a disproportionate amount of the Court's resources as currently pleaded.  The eight asserted patents cover a diverse set of fields.   Specifically, two of the patents describe processing and routing data packets and communications; another two are focused on reducing network traffic and congestion; another two describe encoding and transcoding multimedia data; and the final two deal with webserver processing more generally, such as caching and classifying webpages.  The patents collectively include 253 claims.  There are 22 different named inventors across the eight patents.  OM is targeting at least 16 Oracle products and features covering functionality that ranges from network traffic management and load balancing, to threat intelligence and firewalls, to Linux distributions packaged by Oracle, to analytics and application performance monitoring, to media services and media streams, and beyond.  Compl., ¶¶ 79, 106, 135, 161, 183, 209, 230, 255.  If the case proceeds as currently structured, the claim construction process, summary judgment, *Daubert*, pretrial, and trial will be significantly more complex than a more typical case.  A trial would no doubt take several weeks to complete and involve double-digit numbers of witnesses.

Before filing this motion, Oracle described its concerns to OM and gave it the opportunity to amend.  It declined to do so.  Given the burdens that this case, as structured, will create for the Court and the parties, and given OM's conclusory and inconsistent pleading, Oracle respectfully requests that the Court dismiss the case and require OM to file an amended complaint that plausibly alleges infringement.

## V.       CONCLUSION

For the foregoing reasons, the Court should dismiss the complaint.

Respectfully submitted,

*/s/ Karen E. Keller*
John W. Shaw (No. 3362)
Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Lindsey M. Gellar (No. 7202)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
kkeller@shawkeller.com
arussell@shawkeller.com
lgellar@shawkeller.com
*Attorneys for Defendant*

OF COUNSEL:
Jared Bobrow
Diana Rutowski
Jason Yu
Parth Sagdeo
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park CA  94025-1015
(650) 614-7400

Michael Chow
ORRICK, HERRINGTON & SUTCLIFFE LLP
2050 Main Street, Suite 1100
Irving, CA 92614
(949) 567-6700

Sarah Mullins
ORRICK, HERRINGTON & SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105
(415) 773-5700

Dated: January 18, 2024